Good morning, counsel. Good morning. May it please the Court. Eugene Scalia, representing the plaintiffs. I've reserved five minutes for rebuttal, and, Judge Winn, I'll keep an eye on the clock. Thank you. There is a well-established framework for evaluating speech regulations such as the laws at issue in this case. Applying that framework here, it is clear that the district court should be reversed and directed to enjoin both laws. So, to do so, first, these laws compel speech. That means they are content regulation, which means that they are presumptively unconstitutional. Second, this puts the burden on the state. The state bears the burden to demonstrate these laws' constitutionality. And third, the state stakes all on its claim that these laws compel commercial speech. That is their case. But the laws involved here involve compelled speech that meets no definition, no recognized definition of what constitutes commercial speech that's been articulated by any court, and it's just not true. As the State says a dozen times in its brief that the compelled speech here provides parties to transactions information about those transactions, it's just not so. Well, counsel, let me ask you this, because the analysis actually may differ as to 253 versus 261. I think it's certainly harder on one statute versus the other. Is it your position that compelled disclosure of anything that has to do with business judgment is non-commercial, or do we have to look at the fact that the compelled disclosure really calls for expression on sensitive matters, political or ideological matters? Your Honor, the second part is not a necessary part of the threshold determination of whether or not this Court is reviewing commercial speech. The question is, does it propose a commercial transaction? That is the core definition that's been recited by the Supreme Court time and again. In close cases, which I would submit this is not, but in close cases, courts look at the Bulger factors. Not one of the three Bulger factors is met here. These are not advertisements. The compelled speech does not concern products, and the companies forced to make this speech certainly have no economic motivation to do so. So the Bulger factors are not met. And again, the State has... And I think that's the difficulty, right? You anticipated where I was going to go with this line of questioning, which is how closely tethered to commercial transactions does it have to be. And we have a case that's very recent, the Farmer v. Dolfi case. And here, you know, this relates to stock and capital purchases, which seem to be commercial transactions. So maybe the tethering under the Bulger factors aren't close enough, and I take it that you would want us to more strictly apply the Bulger factors then. Your Honor, the State certainly embraces the Farmer case, but it's actually quite unhelpful to them. Farmer, which did draw a dissent, nonetheless was quite insistent that the speech there was, quote, closely tethered to specific transactions. It said the speech compelled was product-specific, and it said it concerned transactions. It said that it was very close to the core in Central Hudson of speech proposing a commercial transaction, because after all, it involved prices for drug products. So here, we have no identified transactions. We have no identified products. And we don't have any information that is being provided about any product or any transaction. Instead, it's wholly unrelated. Farmer, Judge Winn, as I think you mentioned, talks about closely tethered to a transaction. How could that be? There is no transaction requirement here, and there's certainly no close tethering. So in other contexts, are companies required to make certain disclosures? They are. Nothing like the extraordinarily voluminous reports here. In almost every single case before the Court, a company has been required to disclose a few words or, in the CTI case, a few sentences. Here, just the incorporated documents are 100 pages in one instance and 70 pages along in the other, telling you what you have to say. So different in kind. And, Judge Winn, the other thing I would really underscore in responding to your question about, you know, other kinds of company disclosures is what this Court and the Supreme Court have been emphatic about, which is that the courts must be very cautious about marking off new areas of speech for reduced constitutional protection. And there is no doubt that this standard, holy lack of standard that is being proposed by the State here, is a far, far extension beyond what's been recognized in any prior case as commercial speech. And the Supreme Court says, can't do it. Counsel, I'm going to ask your friend this question, too. Has the State ever argued in this case that any portions of either of these statutes is justifiable as an incidental regulation of conduct? I think it might have made a half-hearted effort at that in the district court, which it gave up, Your Honor. But your use of the word incidental reminds me that in Farmer, that was another point this Court made in footnote 18. It's incidental to a transaction. Here, just not the case. So I don't believe they — I know they've not made that argument in this Court, Your Honor, so it's — Yes, I — So it's waived. I know that. I know that. So it's waived. I know that as well, but we're at a preliminary stage. And there's no doubt that in some areas, California regulates emissions. That's correct, Your Honor. And this — these reporting requirements are not tied at all to any particular California emissions requirements. California can regulate emissions. That is a better way to achieve one of the three purposes it's identified for this law. But, of course, California's regulation of emissions within its own borders can't license its attempts to regulate emissions beyond its borders, or for that matter — and here's another important point when we talk about tethering. This law, neither one of them is even about transactions within the State of California. They've tried to liken the statutes here to the securities laws, and there are many differences, which I'd be happy to address with the Court, but they're not even addressing investors in California or consumers in California. It applies globally without that narrowing point either. But, again, what I would underscore centrally is, first, it's not commercial speech under any recognized definition. And, second, as the Supreme Court also said in NIFLA, that its precedents do not permit — do not permit States to engage in regulation of speech without persuasive evidence — persuasive evidence that that regulation stands in a long history of regulation of that nature. And, again, the State has no prior speech regulation remotely like this one. Let me ask you this, because I think that the closed tethering is an important issue in this particular case. Why can't we view, in particular, the scope one, scope two, and even the scope three disclosures in 253, a kindling product warnings to those engaging in stock and other capital transactions? Is that an inapt analogy? And if so, in what way? Your Honor, I think it's a great analogy to ask about. And it utterly fails because there's no identified product. Every other compelled speech case is about one product. It's about your cell phone in CTIA. It's about drugs and drug pricing in the pharma case. It's a long list that this Court is familiar with. This is every product. This is you buy a handbag anywhere. And supposedly, you need to know how many hydrofluorocarbons a company admits and how many parafluorocarbons that company admits. Again, there's zero tethering, and there's no relationship to a product. In that regard, I also want to underscore the complete lack of tailoring of this law, which also sets it apart from any compelled speech requirement that's ever been reviewed by this Court, any other Court. There was literally zero tailoring by the state. The Supreme Court has said in the Greater New Orleans Broadcasting case that the statute should indicate that the regulator has carefully weighed the costs and burdens that are being placed on speech by a statute. California never did that because it took two voluntary frameworks that are international, and for both reasons have no consideration of First Amendment rights, and simply required everything that's in them, lock, stock, and barrel. So, Judge Winn, if, for example, the state of California did want to engage in product-specific disclosure requirements, such as in the other cases we've talked about, it should identify the product, should identify what needs to be about that product, and should then make sure that it is closely tethered and meets all the necessary tests. It's just done absolutely nothing like that. And so that lack of any tailoring is yet another reason that it can't, even if this Court were to adopt lesser scrutiny, it simply can't survive. I also want to emphasize both in NIFLA and this Court's decisions and CTIA and other cases, X-Corp, NetCoalition, how important it is that if you're going to claim that it's related to a product disclosure or the like, it needs to be provided in the context of the provision of that product. What NIFLA says is that Zatterer involved speech that was required in the commercial speech of the advertiser. In other words, there's not merely a product requirement. It's that the speech be presented in the context of presenting that product. Let me ask you this, Mr. Scalia. If we were to disagree with you that it's not just compelling disclosures on business judgments, but the focus and the concern really is compelling businesses to express a policy view or express some normative view through language that's dictated by the State, that has to be part of the analysis. In that instance, is GHG emissions data, just the data alone, scope one, scope two disclosures, for example, in any way political or controversial or ideological? Your Honor, I believe it is, and if I could explain that in a moment. But I want to underscore again that there is a simple framework. It's compelled speech. It's presumptively unconstitutional. If it's going to be commercial speech, it has to meet the commercial speech definition. If it doesn't, this Court need go no farther. But it is true, in fact, that the 253 disclosures do not meet the Zouderer test in a number of ways. It is not purely factual and uncontroversial. Companies are being required under what's called a corporate climate accountability law to report emissions by other people as, quote, their emissions, the emissions of the reporting company. That is what the statute says. That is a false attribution. That's the scope three? That's scope two also, which companies have to provide reports on in August. That is not purely factual, Your Honor. It's also controversial, because what this law tries to do is to force companies to own responsibility for other companies that they interact with so that they will press those other companies to reduce their emissions. And so that's not purely factual, and it's not uncontroversial. But again, it's so entirely removed from any statement that a company's made. The State, when it briefed this, finally got around to identifying the speech that it said was being made, that these disclosures were intended to address. And that speech, they identified seven so-called indicators of greenwashing, which, when the district court looked at it, it was clear. They were actually potentially all true statements. But if the State thought it had a genuine interest to address statements being made by companies about the climate, it should focus on those statements, not require that you report what your emissions of hydrocarbons are, and also other companies do so. So I hope that addresses the question, Judge Winn. But in a nutshell, it's not necessary for this court to conclude that these laws are unconstitutional, or rather, that the State has failed to carry its burden to find that they are not purely factual and uncontroversial. But indeed, they are, and they are also not made in conjunction with presenting or offering a product to the market. It's just merely a reporting of operations, correct? Factual data that derives from the company's operations. When we report the emissions data, without any regard to any judgments or values concerning climate change, correct? It's just, these are our admissions. Well, with respect to SB 261, in fact, a lot of opinions, judgments, predictions about the climate, about regulators, need to be made. With respect to 253, Your Honor, it's actually not just about a company's operations. It's about other companies' operations. And again, it's in a total absence of this threshold requirement that there be a product or a service, if I could maybe wrap up for the moment, unless there are further questions, and remind you again of what the State has insisted a dozen times in its brief relying on PhRMA, that this is information about a transaction being provided to the parties to that transaction. I only ask, what is the transaction? What is the transaction-linked information? They can't satisfy their own standard. All right. Thank you. Before you sit down, I know you wanted to sit down, but let me see if my colleagues have any additional questions at this point. Thank you. Okay.  Good morning, Your Honors. May it please the Court. Caitlin McLoone for Appellees. Plaintiffs started with the definition of commercial speech, and I think that's a good place to start here, because they've identified a very narrow definition that's not reflected in the case law. We know from Central Hudson that the commercial speech test is a common-sense inquiry that focuses on how closely the relevant expression relates to, quote, the economic interests of the speaker and its audience. We also know from PhRMA, which this Court was discussing, in synthesizing the Court's fact-driven analysis as applied to compelled speech scenarios, that whether the compelled disclosure provided parties — that the test is whether the compelled disclosure provide parties to actual or potential commercial transactions with information about those transactions. Well, we said — we said recently in Ex Corp commercial speech is usually defined as speech that does no more than propose a commercial transaction. Yes? That's correct, Your Honor. But other courts have articulated it as, again, a common-sense inquiry that's not tied to one bright-line standard, and courts are clear, when identifying that as sort of the core definition, that there are other definitions that have been used, including the one articulated in PhRMA most recently, where they were looking at this type of compelled disclosure, and whether or not, to the panel's discussion, there's a close tether between the speech compelled and the transactions. And here, CalPERS testified in numerous studies and surveys before the Court confirmed that uncertainty about the physical and transition risks facing companies from climate change can lead to market distortions and misallocation of resources and significant volatility in financial markets. What is the — what's the specific commercial transactions at issue, for example, in 261? The specific — well, looking just at the interest that the District Court found was substantial and fully supported, it's the investment product, and the California investors and other stakeholders, lenders, insurers, evaluating the — how to price and how to evaluate the riskiness of that particular investment decision. The evidence here shows that some 85 percent of North American institutional investors analyze the emissions of their investments, including, per CalPERS declaration, the state itself. And somewhere between 86 to 98 percent of the largest companies doing business in the state attract investors and other commercial counterparties by publishing voluntary emissions or risk reports. But the information that these companies choose to voluntarily disclose is not standardized, and it's often selective, fragmented, and unverified. And so the state is filling the gap — and with regard to, for example, Scope 3 disclosures in 253. The commercial transaction for looking just at the 253 — Scope 3. Scope 3 is the evaluation of the overall risk that the company faces, specifically transition risk, in an economy that's facing climate change. So if there's going to be certain taxes on emissions or cap-and-trade programs, it's going to impact a company that has a large emissions burden. It would impact investor or lender's assessment of the risk of that product, depending on what the overall emissions load of that company is. Here — But this they have to gather from third parties. Yes, Your Honor. Under the GHG protocol, which is integrated into the law, there are standardized — there's a standardized accounting protocol for determining a sort of comparable, consistent way of measuring the emissions — the overall emissions that a company is facing. And that number is directly relevant to the risk assessment that California investors and other lenders, insurers are making daily in order to determine whether or not their money is safe in that product, whether or not they want to invest in a particular company or not. That is closely tethered to the transaction that they are considering making. And there's ample evidence in the record that the District Court relied on to find that both investors are actively interested in this information. And in fact, that when you look at the overall emissions of a company, including Scope 1, 2, and 3, that is tied to the price of investment products and that investors do demand a premium. Kind of in a general fashion. So you're relying on the same evidence in the record to support Scope 1 and 2 emissions for Scope 3? Or is there additional evidence that would really show that the disclosures from third parties would materially advance the emissions reduction interest? Your Honor, the evidence in the record suggests that it's the overall emissions burden. So Scope 1, 2, and 3 that a company faces that impacts the sort of risk premium that investors assign to companies with high emissions burdens. So it is directly tied. It's the scope, the full scope of emissions that a company is facing. And you could see why that is. Because a company that has a large emissions burden in their supply chain, the pricing of their commercial products will be impacted by various regulatory programs that might increase the burden of sort of high emissions companies within the stream of their business. In your view, if a company, I'm sorry. In your view, if a company doesn't already have access to Scope 3 emissions data, can they comply with the statute merely through secondary sources? Or do they have to affirmatively seek that from the third parties? Your Honor, the protocol under the GHG protocol that's integrated into the law provides for various methods for determining the Scope 3 value. Right. Are those methods satisfied through secondary sources or other ways? Or does it have to be a direct engagement with the third parties to seek their information? No, Your Honor. They could directly engage, but they can also use various methods of estimation that are integrated into the protocol. And would those methods involve a great burden, expense, and volume of data and an obligation on the part of the reporting entity? No, Your Honor. There are any number of both entities and computer programs that exist to assist companies in doing this. And in fact, a large percentage, I want to say 50 percent, it's less than the sort of 98 percent that are doing some amount of emissions calculation and putting that information into the market. But a significant percentage of them are already analyzing their Scope 3 data because, again, investors are seeking this information now. The problem is that companies are trying to meet that need by providing voluntary data into the marketplace. That's just inconsistent, it's not verified, and there are gaps. So it's that gap of information that the legislature was seeking to respond to in passing these laws. Counsel, California regulates emissions, yes? Yes, Your Honor. And is your friend correct that at one point California made an argument that some of these disclosures were justified as the incidental regulation of conduct, but then abandoned that? Your Honor, it's correct that we, that the state made the argument in the court below that there's an incidental regulation, but the argument was not hinged on emissions regulation. Again, the focus is on regulation of information in the marketplace. So it had to do with the state's longstanding ability to regulate and protect consumers and investors in the state. So the state has never argued that these disclosures could be justified as an incidental regulation of the state's ability to regulate emissions? No, Your Honor, because neither SB 253 nor SB 261 are emissions regulation. And that was litigated in a separate proceeding with the motion to dismiss because there were various arguments about extraterritoriality and preemption. And the district court agreed with the state that this is about regulating information. It's about transparency to the market of decision necessary data about companies that allows investors and others to evaluate risk. It's also, again, to the other interest, about correcting this sort of inconsistent or incomplete data, so, which allows companies right now to provide selective emissions disclosures that companies are using to sort of mislead through omission the marketplace. But there's no, the state has never contended, and it would be incorrect to say that this is an emissions regulation because there's no penalty on a company if they are disclosing that their emissions go up. There's no penalty on a company tied to whether or not they're a high emitter or a low emitter. Can I have you turn, counsel, before your time runs out, to 261 because I'm concerned on the potential breadth of the disclosures that would be mandated, in particular because in order to comply, the disclosures would have to be very specific and very complete. How is this not calling for companies to express policy views on the impact of climate change, which some would consider to be controversial? For SB 261, Your Honor, there's no normative view expressed. A risk assessment is a commercial metric, and it's not a political one, that a company believes, as an example, that the war in Ukraine will affect their supply chain does not impart a view on the war itself. A company saying, we anticipate that our supply chain will be impacted. Well, that's all somewhat in the details, and that's why I asked the question, right? The way that the statute mandates disclosures in very broad language, complete and specific information, including scenario analysis involving, developing strategic plans that are more flexible, robust on a range of plausible future states, governance issue, R&D priorities. I don't know how, and it requires not only disclosure of specific metrics and targets may seem a little more factual, describing the board's oversight. How do you provide the scope of information that seems to be required or mandated by the state without injecting or commenting on your policy views on these issues of climate change? I can't tell what the limits are. So if you say, okay, risk disclosure, what does that really mean when you have to describe and provide scenario analysis? Yes, Your Honor. The disclosures required under SB 261 are, there are numerous categories, but all of them have to do with whether or not the company has assessed or has done that particular type of analysis, and if so, what that analysis is. It doesn't ask a company either explicitly or implicitly to weigh in on anything that sort of hinges on their normative view of climate policy or. But the discussions, it's hard to see how the discussions and evaluation and analysis wouldn't involve an expression of normative views on these issues. Let me ask it another way, and maybe this will help me better understand the scope of what the government's view of the scope of disclosure. How is the information that the companies are required to disclose under 261 the same or different than the types of information that the companies already provide through SEC reports or other securities reporting schemes? Your Honor, in many instances, it'll be quite similar. The core question of is there a material risk to the company from climate change may produce overlapping disclosures, and we provided examples. But to an extent, it's similar. Then why does the state need these additional disclosures to be made in order to mitigate risk to financial transactions? That just seems very broad and very vague, very ill-defined. That's correct. Not ill-defined, Your Honor, but there are categories of disclosure. In terms of its breadth, right?  So what it takes to comply, how much you have to comment or express your policy views. Because it just says describe and evaluate. That, to me, is pretty comprehensive. There are disclosures required under the TCFD protocol, which is integrated into the law, that go beyond what companies may be disclosing in their SEC. For example, how often the board of the company is being advised about climate risks. The sort of subcategories. Can you give me a few more examples of the compelled disclosures that would go beyond what would be required in terms of disclosures to the SEC? Yes, Your Honor. And we've provided example disclosures, voluntary disclosures, that have been produced in the record. Those can be found at 7 S.E.R. 1877 and 7 S.E.R. 1926, among some other places. There are sort of four main categories of disclosure. The governance disclosures is the example that I was just giving. So one example that you'll see is that our executive management team sets our sustainability and business strategies, approves goals, provides resources to meet performance targets, and has oversight of our sustainability practices, including our approach to climate. Again, it is providing the public with what the company internally has already done or is assessing in terms of how they analyze risk. And the TCFD disclosure that includes these categories, or that selected these categories, was created by sort of industry and investors and rating agencies to identify the information that is most useful to investors and lenders and insurers in determining the overall climate risk. Like, for example, describing the resilience of the organization's strategy, taking into consideration different climate-related scenarios, including a two-degree centigrade or lower scenario. Correct, Your Honor. So the company would not need to have done that analysis, but they would need to disclose if they have. And if they have analyzed under a particular scenario that the company faces certain risks to its supply chain, that would be disclosed within the SB 261 disclosure. That this doesn't sort of go over into sort of implicitly endorsing a political position is clear from an example. So if a company believes that climate change is a significant issue, is spending, you know, their sort of commercial money investing in sort of political action to address climate change, they may nevertheless have determined that their company does not face material risk from climate change. And so their disclosure, despite what they're doing and despite their view about climate change being a significant issue facing the society, they might disclose, quote, we do not believe climate change poses a material business risk. So there's no tie, even implicit, between how a company has assessed the impact of climate on the overall financial success of their company or their sort of future thinking and what their political or policy view is. The TCFD is designed to, by industry, by companies, by rating agencies and insurers who came together to say, how can we avoid the next financial crisis? What are the things we need to know to determine whether a company is situating itself to respond to potential economic risks, volatility in the market from a pretty significant change in the regulatory landscape, in what consumers might be interested in, in physical impacts to the company, perhaps from increased flooding. And we do see examples in the disclosures at 6 S.E.R. 1714. I have an example disclosure that shows, for example, to avoid the effects of climate-related events impacting our data centers, ServiceNow implements a policy, where possible, of locating our redundant data center pairs with a minimum radial distance of separation to act as a backup, ensuring we can deliver a product to our customer. This is the type of disclosure. It is business-related. It is risk assessment, which companies are used to doing. And to Judge Nguyen's point, companies are already doing for the purposes, public companies, for the purposes of SEC disclosure. This is both, has that close tether to commercial transactions because it's related to the risk assessment of the corporation. And there's a gap in information. There are companies out there saying these things, but they're not doing so in a way that's sort of standardized, complete, from which investors can properly make the assessment. And in fact, we have on the record a statement that investors are spending sometimes millions of dollars attempting to fill the gaps and reverse engineer this climate emissions for SB 253 and climate risk for SB 261 information. But such costly attempts are not accurate or reliable with the information that is currently on the marketplace. I see that I'm running low on time. Let me ask you this, counsel. To the extent that, assuming we haven't discussed the case, so I don't know how the panel is going to go, but to the extent that there's concern on the scope 3 admission disclosure requirements, should we send it back for severability analysis? Did you advance a severability analysis below or argument below? Yes, Your Honor. I would think it would be appropriate to allow the district court to reevaluate that if that's how the panel proceeds. I'll just note in closing that the district court's conclusion that each law serves a substantial state interest in providing California investors, lenders and other stakeholders with information allowing them to accurately price risk is supported by voluminous factual findings and it's well within the court's reasonable discretion on the basis of those facts. Thank you, counsel. Thank you. The State has framed its argument almost exclusively in terms of a purported investor interest or potentially investor risk. There was scarcely a mention of consumer interest, much less the State's purported interest in reducing emissions. I'll come to that in a moment and I want to begin by making clear that even supposing the State were able to establish this as commercial speech, it simply could not place this within the Zatterer framework because that very loosely defined description of what the transaction was that you heard from the State's counsel doesn't fit the Zatterer requirement that compelled speech be provided in the commercial speech, which is what NIFLA says, in the commercial speech. This is not speech required at the time that an advertisement is being placed. It's not even speech being required when you present your product to a customer, as in the CTIA case. Instead, regardless of any transactions or any products, it has to go on your website, it has to be publicly reported with no connection to any transaction. That can't meet the nexus in context requirement required for Zatterer. In NIFLA, the Supreme Court said that in Zatterer, if the speech required there had not been in an advertisement, it would have been unconstitutional. And the speech here is not being required as part of an advertisement nor in the presentation of a product. Even supposing that Zatterer were applicable here in any event, the State would need to show that the disclosures required by 261 are no more extensive than reasonably necessary and for 253 as well. The governor, when he signed 253, said, this is too much. He said, this is costly. And Judge Wynn, in answer to your question, there's evidence of the record. Scope 3 and 2 are extraordinarily costly, millions of dollars at times for individual companies. And the SEC is the agency that's entrusted by Congress to regulate investor interest. The SEC took a look at this very issue. It adopted a rule that, although quite problematic in itself constitutionally suspect, did not go nearly as far as the laws required here. So how can 253 and its costly GHG disclosures that the governor himself condemned in signing the law be no more extensive than necessary under Zatterer, much less meet the higher standard? The securities laws and commercial speech regulation requires that there be a harm, which is going to be addressed, fraud, deception. The State has not identified that real harm, nor has it shown, as it has to do under Central Hudson, that the requirements here will materially advance the harm that they've identified as a real harm. They simply have not explained those fundamental requirements. What's quite striking is the State, time and again, expressed the need for 261 in terms of investor interest. They did not talk about the materiality of this to investor decisions, which is a core consideration when you're talking about protecting investors. If you're going to be no more extensive than necessary, you're going to require materiality, Well, investor interest and informational asymmetry is the other big one. Well, Your Honor, and that was raised in the Pharma case, where the court said there was going to be unfairness in transactions because proper information regarding specific transactions wouldn't be disclosed. If investors' interest in having additional information were sufficient to compel speech, there would be no end. There is no limiting principle. Judge Wynn, in your dissent in the American Beverage case, you said, no, Zouderer should be limited to correcting deceptive disclosures. If we go beyond that, we are going to have a proliferation of laws infringing speech with only a tenuous connection to legitimate State interests. Now, the court nonetheless extended Zouderer, but nowhere nearly as far as this, and what you predicted in that opinion is what you see here. Mere interest, customer curiosity, which this court has already rejected, is being given as the reason and last point. The State has said, well, different companies are saying different things. It's inconsistent. That is not just an improper basis for State regulation. It's chilling. We have a marketplace of ideas. That is free speech. Different companies can say different things. They have not carried their burden to show that they can infringe and compel speech in that way as required under this court's precedence and those of the Supreme Court. All right. Do you have any additional questions? Thank you very much, counsel, to all counsel for your very helpful arguments in this challenging case. The matter is submitted and we'll issue a decision in due course. That concludes today's calendar and the argument for the week. So court is adjourned.
judges: NGUYEN, BENNETT, Matsumoto